(October 11, 1984)

■ MURIEL WINEGRAD et al., Respondents, v NEW YORK UNIVERSITY MEDICAL CENTER, Defendant, and JOSEPH JACOBS et al., Appellants. — Order, Supreme Court, New York County (Leonard Cohen, J.), entered May 22, 1984, denying defendant physicians' cross motion for summary judgment, is reversed, on the law, without costs, and the cross motion for summary judgment dismissing the complaint is granted, and the complaint is dismissed as against defendants Jacobs, Pasternack and Ross.

This is an action for damages for medical malpractice.

The complaint and the bill of particulars are uninformatively broad, in essence merely alleging that defendant physicians failed to properly diagnose and treat plaintiff Muriel Winegrad (hereinafter plaintiff) and failed to prescribe acceptable medication. There is no specification of what the failure to diagnose and

treatment consisted of or what the proper medication was. Although the bill of particulars does attempt, in conclusory terms, to elaborate these charges, it is so broad as to be quite uninformative.

The complaint alleges that plaintiff engaged Dr. Jacobs as a physician "to perform surgery about the area of her eyes" and that in the course of the operation she was "caused to go into a state of shock" and to suffer arrhythmia. From Dr. Jacobs' affidavit it appears that he attempted to perform a blepharoplasty ("Plastic surgery involving the reconstruction of part or the whole of an eyelid" [1 Schmidt, Attorneys' Dictionary of Medicine]) and that the procedure was not completed since plaintiff developed a cardiac arrhythmia.

The operation, and therefore the alleged malpractice, occurred in December, 1980. This action was begun in May, 1981. In April 1984, three years later, plaintiff made a motion for sanctions with respect to defendant physicians' alleged failure to comply with orders for examination before trial, and defendant physicians thereupon cross-moved for summary judgment dismissing the complaint. In their affidavits, each physician states that he or she is a physician duly licensed to practice medicine; that they examined or treated plaintiff; and in Dr. Jacobs' case, that he attempted to perform a blepharoplasty, and that the procedure was not completed since plaintiff developed a cardiac arrhythmia. Each physician goes on to state that he or she has reviewed the medical records including his or her own records, and "with a reasonable degree of medical certainty that I did not deviate from good and accepted medical practices in my treatment of plaintiff, nor did anything I do or allegedly failed to do proximately cause the plaintiff's alleged injuries."

While these moving affidavits are bare of further detail, this is understandable in view of the lack of specificity in the charges.

Instead of responding to the affidavits by giving expert — or even lay — opinions or facts as to the alleged malpractice, plaintiffs merely submitted their attorney's affirmation discussing the defendants' alleged failure to comply with the orders for examination before trial. This was a wholly insufficient response to the motion for summary judgment. This case is very similar to our recent decision in *Neuman v Greenstein* (99 AD2d 1018), where we granted summary judgment dismissing the complaint in a malpractice action. The affidavits in the present case are obviously modeled on those in the *Neuman* case (the same attorneys represented the defendant physicians in each case). In the *Neuman* case (*supra*) we said: "Where a medical

malpractice defendant, in a motion for summary judgment, asserts that he performed the operation in accordance with accepted standards of medical practice, and thus should not have been named as a party defendant, the plaintiff must respond with rebutting medical evidence demonstrating a departure from accepted medical procedure (*Pan v Coburn,* 95 AD2d 670) * * * At least some statement of medical expertise in rebuttal was required in order to defeat defendant's motion for summary judgment."

This is not a case where a plaintiff contends that she does not know what the specific malpractice is and will not know it until she has had an opportunity to depose defendants. Here plaintiffs' attorney stated on oral argument that he had this information, including which contraindicated medication had been administered and the opinions of experts, but that he intentionally chose not to divulge this information before he had completed his examination of defendants. Such tactics come uncomfortably close to attempted litigation by ambush. They are a complete failure to meet the often-stated obligation "incumbent upon a [party] who opposes a motion for summary judgment to assemble, lay bare and reveal his proofs, in order to show that the matters set up in his [pleading] are real and are capable of being established upon a trial." (*Di Sabato v Soffes,* 9 AD2d 297, 301.) "We have repeatedly held that one opposing a motion for summary judgment must produce evidentiary proof in admissible form sufficient to require a trial of material questions of fact on which he rests his claim or must demonstrate acceptable excuse for his failure to meet the requirement of tender in admissible form". (*Zuckerman v City of New York,* 49 NY2d 557, 562.) Concur — Murphy, P. J., Asch and Silverman, JJ.

Kupferman and Fein, JJ., dissent in a memorandum by Fein, J., as follows: I would affirm the order appealed from which denies the cross motions of defendant doctors for summary judgment and directs that their answers be stricken unless they submit to previously court-ordered examinations before trial, which they have thus far successfully evaded in this medical malpractice action. They have blatantly disregarded a prior court order directing that their depositions proceed on a designated date and proceed continuously on a day-to-day basis. After their deposition of plaintiffs was completed, defendant doctors arbitrarily chose their own dates for continuing their depositions, contrary to the court order. When plaintiffs' attorney refused to comply, the doctors proceeded to set up alleged defaults by plaintiffs based on their own schedules.

In response to plaintiffs' appropriate motion to strike their answers, defendant doctors cross-moved for summary judgment

based on bare-bones affidavits. The affidavits of the doctors each state, *in haec verba,* only:

"I have reviewed all of the medical records pertaining to the above-captioned action including my own records.

"I now state with a reasonable degree of medical certainty that I did not deviate from good and accepted medical practices in my treatment of plaintiff, nor did anything I do [*sic*] or allegedly failed to do proximately cause the plaintiff's alleged injuries. Therefore, I should not have been named as a defendant in the above-entitled action."

In addition, the affidavit of Dr. Jacobs states: "On December 12, 1980, I attempted to perform a blephoplasty [*sic*] on the plaintiff however, the procedure was not completed since plaintiff developed a cardiac arrhythmia."

Nowhere in the affidavits of the doctors is there an explanation of the cause of cardiac arrhythmia or whether it existed or was known to exist prior to the operation or whether its existence or its possible onset was determinable by them prior to the operation, or whether it spontaneously occurred during the operation. In 1 Schmidt, Attorneys' Dictionary of Medicine, *arrhythmia* is defined as: "A loss of, or variation in, the normal rhythm of the heart beat. Thus, there may be missed beats, extra beats, slow beats, fast beats, etc."

*Arrhythmia, sinus* is defined as: "1. Loss of the normal rhythm of the heart beat, due to interference with the passage of the impulse which regulates the beat. It is regarded as normal when it occurs in children. 2. An irregularity in the heart beat which consists of a slowing of the rate during expiration (breathing out) and an acceleration of the rate during inspiration (drawing in the breath). This variation is regarded as physiologic or normal. Also called *phasic sinus arrhythmia.*"

No explanation whatsoever was given in any of the doctors' affidavits as to whether the existence of this condition was determinable or determined upon preoperation examination or diagnosis, or whether it appeared suddenly during the surgery, and if so, why. Thus, we have an admission by the doctor who performed the surgery that some serious irregularity in the heartbeat required an interruption in the operation. On the face of it, further explanation was required of this doctor as well as the other doctors. Plaintiffs were plainly entitled to examinations before trial on that very basis.

Contrary to the majority opinion, that condition is alleged in plaintiffs' complaint:

"FOURTEENTH: That on or about the 12th day of December, 1980, while the defendant, JOSEPH JACOBS, was engaged in the performance of surgery upon the plaintiff, MURIEL WINEGRAD, she was caused to go into a state of shock as she was informed and verily believes, and she was caused to suffer an erythmia [*sic*], and was required to be removed to the coronary emergency unit of the aforesaid hospital, and to undergo various tests and treatment, and to suffer severe shock to her physical and nervous systems.

"FIFTEENTH: That subsequent to the aforesaid surgery, and by reason of the aforesaid, the defendants, PETER PASTERNACK and JANE ROSS, undertook to treat and observe the plaintiff, MURIEL WINEGRAD, and do whatever was necessary in regard to her condition."

The complaint further alleges other consequences of the termination of the surgery and the administration of drugs in connection with the arrhythmia during and after the operation.

The bill of particulars in various paragraphs makes similar allegations and further alleges: "In addition, the defendant Joseph Jacobs failed to correct the condition of the said plaintiff which he had undertaken and agreed to perform, with the result that said plaintiff's features have been altered and disfigured, the surgery not completed and improper and wrongful charges made therefor".

This is hardly a case in which plaintiffs are seeking to ambush defendants, as suggested by the majority. Quite the contrary. The physicians admitted the occurrence of the arrhythmia. They gave no explanation whatsoever of what it was, how it was caused or whether the condition preexisted the surgery or occurred during it, and whether such surgery was appropriate in the light of such condition. In the face of such admission by the physicians, plaintiffs are entitled to an examination before trial. The physicians should not be permitted to take refuge in the mere repetitive incantation that they "did not deviate from good and accepted medical practices". *Neuman v Greenstein* (99 AD2d 1018), relied upon by the majority, is not to the contrary. In *Neuman* there had been an examination before trial of the defendant Dr. Pratilas. He was the anesthesiologist during an emergency laparotomy performed by another physician during the hospital stay of the plaintiff's decedent. The decedent was hospitalized from November 15, 1978 until the date of his death on December 11, 1978. A bilateral adrenalectomy was performed on him sometime between the date of his admission and December 4, 1978. Dr. Pratilas was not involved in that surgery, nor in any treatment of the decedent from the date of his

admission until December 5, 1978, the date of the emergency laparotomy. Decedent died six days later. The record is clear that Dr. Pratilas' sole function was as the anesthesiologist during the December 5 operation. Although one of the causes of the death was listed as "pulmonary congestion", the record was clear and uncontroverted that no complications had arisen during the operation, that the decedent's vital signs had been stable throughout the operation, and that the doctor had had no contact with the decedent after the December 5, 1978 operation. On the basis of such a full showing in his affidavit and deposition, we held in that case (*supra*) that the anesthesiologist's conclusion that he " 'did not deviate from good and acceptable medical practices in administering anesthesia to the decedent' " constituted " 'expert opinion evidence' ", appropriate to sustain summary judgment in the absence of expert evidence to the contrary.

The motion for summary judgment by the doctor in that case was premised and granted upon the basis of a full showing by the doctor of everything that occurred in which he was involved.

This is a far cry from the present case where there has been no disclosure whatsoever by defendant doctors other than a concession by defendant Dr. Jacobs that a condition arose during the operation which required its termination. Nothing is vouchsafed as to whether it could or should have been anticipated. There is simply no foundation in this record for the expert opinion of the defendant doctors. Their mere bare-bones denial is palpably insufficient.

Although plaintiffs might have been better advised to submit an affidavit of an expert, on this record they were not required to do so. They were entitled to an examination before trial of these physicians, as in *Neuman* (*supra*).

*Pan v Coburn* (95 AD2d 670), cited in *Neuman,* is not to the contrary. There the plaintiff asserted that because he had a cause of action for lack of consent, he had no obligation to support his second cause of action for malpractice by rebutting the medical evidence offered to show that the defendant doctor had done nothing which was the proximate cause of the injuries claimed. This has nothing to do with our case.

On this record, plaintiffs' cause of action should not be lightly tossed off on a motion for summary judgment. An examination before trial is appropriate. There is sufficient evidence of malpractice in defendant doctors' papers.